IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 14-CV-3353-MSK-STV

LARRY WILLIAMS, and
LNL PUBLISHING INC.,

     **Plaintiffs,**

*v.*

GENESIS FINANCIAL TECHNOLOGIES INC.,
GLEN LARSON, and
PETE KILMAN,

     **Defendants.**

---

**OPINION AND ORDER ON MOTION FOR EQUITABLE RELIEF, MOTION FOR
JUDGMENT AS A MATTER OF LAW, AND CLAIM FOR UNJUST ENRICHMENT**

---

     **THIS MATTER** comes before the Court on the Plaintiffs' Motion for Equitable,
Injunctive, and Declaratory Relief (**# 116**), the Defendants' response (**# 120**), and the Plaintiffs'
reply (**#129**); and the Defendants' Renewed Motion for Judgment as a Matter of Law and
Renewed Motion to Dismiss (**# 117**), the Plaintiffs' Response (**# 121**), and the Defendants' Reply
(**# 122**).  For the reasons that follow, the motions are denied.

## I.  JURISDICTION

     The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.

## II.  BACKGROUND

     The Court assumes the reader's familiarity with the facts of this case and the proceedings
to date, and offers only a cursory summary.  The Plaintiffs, Mr. Williams and his associated
entity, LNL Publishing, are known for commodities trading strategies.  The Defendants, Genesis

Financial Technologies ("Genesis") and its principals, Mr. Larson and Mr. Kilman, are authors of a software program, Trade Navigator, that assists in the analysis of commodities market data.

At an undetermined time, Mr. Larson and Mr. Williams entered into an oral contract by which Mr. Williams agreed to include his commodities trading strategies in Trade Navigator and that he would promote the software to students at trading seminars he held. In exchange, Genesis would pay Mr. Williams a specified share of profits derived from the sale of Trade Navigator to his students. The parties abided by that agreement for several years, but relations soured. In September 2012, Mr. Williams informed the Defendants that he was terminating the contract and demanded that the Defendants cease using his strategies, name, and likeness. The Defendants continued to use Mr. Williams' strategies and likeness (as set forth herein), and this litigation ensued.

The case proceeded to a jury trial on the following claims: (1) breach of contract against Genesis and Mr. Larson, (2) breach of contract against Mr. Kilman (relating to a separate non-disclosure agreement), and (3) unjust enrichment against Genesis and Mr. Larson. The jury returned a partial verdict for the Plaintiffs. Specifically, it found that Mr. Larson individually entered into the oral contract with Mr. Williams and that Mr. Williams was entitled to $358,277.50 for Mr. Larson's breach of that contract. The jury found that Mr. Williams was not entitled to any damages from Genesis for breach of contract. The jury also found in favor of Mr. Kilman on the contract claim against him. Rendering an advisory verdict for the Court as to unjust enrichment, the jury found that Genesis unjustly received a benefit at the Plaintiffs' expense by continuing to use Mr. Williams' strategies and likeness after September 2012. The jury suggested that the Court award $400,000 to Mr. Williams and $1.5 million to LnL Publishing on this claim.

In the instant motions, the Plaintiffs request (**# 116**) that the Court to confirm the jury's advisory verdict and award damages on the unjust enrichment claim consistent with that verdict. They also request, as equitable relief, an order enjoining the Defendants from continuing to offer the Plaintiffs' trading strategies, name, and likeness, and an order requiring the Defendants to return such property to the Plaintiffs. The Defendants move (**# 117**) for judgment as a matter of law on the contract and unjust enrichment claims, arguing that there is insufficient evidence to support a breach of contract verdict against Mr. Larson and that the record does not warrant any verdict for the Plaintiffs on the unjust enrichment claim.

### III.   MOTION FOR JUDGMENT AS A MATTER OF LAW

Federal Rule of Civil Procedure 50(b) states that after the Court has submitted a claim to the jury, a party "may file a renewed motion for judgment as a matter of law." The Court may allow judgment on the verdict or direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(1), (3). In analyzing such a motion, courts should construe the record evidence in the light most favorable to the nonmoving party. *Tyler v. RE/MAX Mtn. States Inc.*, 232 F.3d 808, 812 (10th Cir. 2000). Courts must not "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." *Deters v. Equifax Credit Info. Servs. Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000). The Court may grant the motion only if the evidence points in a single direction and is not susceptible to any reasonable inferences that may support the nonmoving party's position. *Tyler*, 232 F.3d at 812.

Mr. Larson moves for judgment as a matter of law in his favor on the Plaintiffs' breach of contract claim against him. In an abbreviated argument, he contends that the contract with Mr. Williams, and all performance thereupon, was made by <u>Genesis</u> (the entity), not <u>Mr. Larson</u> (the individual). The Court finds that there was sufficient evidence in the record to permit the jury to

conclude that the Plaintiffs made the contract with Mr. Larson, individually.  The date on which the contract was entered into, and the existence or corporate form of Genesis at that time, were matters that were significantly disputed by the parties.  Mr. Williams testified that the contract was formed in "late '99, 2000," and made directly with Mr. Larson.  Mr. Larson testified that the agreement was formed in 2002, and was made on behalf of a predecessor entity of Genesis, although there was significant cross-examination as to the particular nature of that corporate entity at that time.

The jury was free to consider and weigh the parties' various testimony on these issues, and they appear to have credited Mr. Williams' testimony.  For purposes of this motion, the Court must also draw all inferences in favor of the Plaintiffs, and the Court finds that there was sufficient evidence to justify the conclusion that Mr. Larson was a party to the oral contract.  The Court does not understand Mr. Larson's motion to challenge the <u>amount</u> of the jury's breach of contract verdict.  Thus, the Court denies Mr. Larson's motion for judgment as a matter of law on the breach of contract claim against him and enters judgment in favor of the Plaintiffs and against Mr. Larson in the amount of $358,277.50.

### IV.   UNJUST ENRICHMENT

The Plaintiffs' unjust enrichment claim is premised on allegations that, after Mr. Williams terminated the parties' oral contract in September 2012, Genesis continued to benefit from the use of Mr. Williams's intellectual property in Trade Navigator and from Genesis' use of Mr. Williams' name and likeness in its marketing.  Genesis argues that: (i) as to Mr. Williams' "libraries" of trading strategies, the unjust enrichment claim is preempted by the Copyright Act; and (ii) the Plaintiffs did not present enough evidence to prove that Genesis enjoyed any particular benefit at the Plaintiffs' expense.  The Plaintiffs argue that the Court should adopt the

jury's advisory verdict on the unjust enrichment claim in the amounts returned by the jury, and also enter injunctive relief: (i) restraining the Defendants from using any of the Plaintiffs' "personal property/data," (ii) requiring the Defendants to return various libraries to the Plaintiffs, and (iii) disable certain Genesis employees' ability to use the libraries in question. Because the Court acts as factfinder on the equitable claim for unjust enrichment, it treats the parties' motions on these issues as trial briefs, and after considering all of the evidence presented at trial, finds and concludes as follows.

An unjust enrichment claim is governed by Colorado law. To prove an unjust enrichment claim, a plaintiff must demonstrate that: (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances rendering it unjust to allow the defendant to retain the benefit without compensation. *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008). The Court understands the Plaintiffs to argue that Genesis received three types benefits at the Plaintiffs' expense after September 2012: possession and use of the libraries themselves, receipt of data fees from customers who used Trade Navigator with the libraries enabled, and use of Mr. Williams name or likeness to promote Trade Navigator.

## A.  The Libraries

Trade Navigator is a software program that receives and displays market data for a variety of commodities markets. Customers purchase the Trade Navigator software from Genesis, and in addition pay Genesis a monthly subscription fee in order to have access to current market data. The monthly fees vary in amount depending on the comprehensiveness of market data and the speed by which it is delivered.

A "library" is a package of indicators or strategies that comprise "a grouping of technical analysis" or techniques. Tr. 455:16–19. In other words, they are one or more mathematical

algorithms or formulas, written in a programming language readable by Trade Navigator, through which users can filter and analyze the raw commodities market data.[1] *See* Tr. 879:1–6. By all appearances, the libraries in Trade Navigator are simply the formulas themselves, unaccompanied by any interpretive or explanatory material. To understand how to use and interpret the results of Mr. Williams' libraries,[2] users had to attend Mr. Williams' seminars. *See* Tr. 879:7–15.

Users obtained the right to use a given library by paying to attend a seminar by Mr. Williams that explained the library in question. The user could then download the library into their personal copy of Trade Navigator, and Genesis would enable their ability to use the library to review data. Tr. 423:1–2. Once a user obtained permission to use a library, he or she retained that right to continue to use it seemingly in perpetuity (unless the customer left Trade Navigator for more than 60 days and later returned, in which case Mr. Williams would have to give his approval to reauthorize access for that user), without the need to make any additional payments to Mr. Williams or Trade Navigator. Tr. 423:8–25, 432:9–15. It is clear that, after termination of the contract in September 2012, Genesis continued to allow users who had been enabled for Mr. Williams' libraries to continue to use them. Tr. 143:12–22.

The Plaintiffs argue that Genesis received a benefit at their expense after September 2012 by continuing to enable Mr. Williams' libraries to be used by Trade Navigator customers. Such a benefit would be at the Plaintiffs' expense only if the Plaintiffs have some continuing property

---

[1]     In simplified form, a library might consist of formulas to the effect of "display all soybean data for Tuesdays following a market gain or loss of more than 1.5% on the preceding Monday" or "graph all oil data for 2017 where intraday spreads exceeded 3%, correlated against historical data for the same trading days in 2016."

[2]     The Court acknowledges that the evidence reflects that Mr. Williams assigned his interests in the libraries themselves to LnL Publishing. Nevertheless, for purposes of convenience, the Court will refer to the libraries as "Mr. Williams' libraries," except where the distinction between Mr. Williams and LnL Publishing is important.

right to control the distribution and use of the libraries.  Property interests in intellectual property can arise in a variety of ways: they may spring from a contractual agreement covering the use of the intellectual property; they may be protected by law, such as copyright or trademark law; or they may receive common-law protection.  It is undisputed that, after September 2012, the parties had no contractual agreement governing the use of the libraries, so the Court turns to the copyright law and the common law to examine whether those sources confer the Plaintiffs some property right in the libraries.

### 1.  Copyright and Copyright Preemption[3]

Genesis argues that the Plaintiffs' unjust enrichment claim (at least as it relates to Mr. Williams' libraries) is preempted by the operation of the Copyright Act.  The Copyright Act preempts state-law causes of action if: (i) the work at issue is within the subject matter of copyright, and (ii) the rights granted under state law are equivalent to the exclusive rights within the general scope of copyright.  *Gates Rubber Co. v. Bando Chem. Indus. Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993) (citing 17 U.S.C. § 301(a)–(b)).  The general subject matter of copyright covers "original works of authorship fixed in any tangible medium of expression" from which they can be reproduced or communicated.  17 U.S.C. § 102(a).  Copyright protection does not extend to an idea, "regardless of the form in which it is described, explained, illustrated, or embodied."  17 U.S.C. § 102(a)–(b).  Even if a work contains un-copyrightable material, it may nevertheless fall within the subject matter of copyright if it is fixed in a copyrightable medium or if it contains

---

[3]  As an initial matter, the Plaintiffs argue that the Court has already decided the issue of preemption under the Copyright Act in an oral ruling in September 2016.  The Court has reviewed that ruling and finds that it did not purport to decide a fully-articulated argument on this issue.  Rather, the Court allowed the unjust enrichment claim to proceed to trial based on a finding that the Defendants' invocation of the doctrine of copyright preemption was incomplete and  insufficient.  Now that the issue has been squarely presented to the Court, the Court addresses it on its merits.

copyrightable material as well.  *See Forest Park Pictures v. Universal TV Network Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

The scope of exclusive copyright rights are: (1) to reproduce the work, (2) to prepare derivative works, (3) to distribute copies of the work, (4) to perform the work publicly, and (5) to display the work publicly.  17 U.S.C. § 106.  To determine whether a common-law claim is preempted, the Court must conduct a factual analysis as well as a legal analysis of the required elements of the common-law claim.  *See R.W. Beck Inc. v. E3 Consulting LLC*, 577 F.3d 1133, 1147–48 (10th Cir. 2009).  The Tenth Circuit uses the "extra-element test" to determine whether a state-law cause of action grants rights beyond the rights in § 106, resulting in a qualitatively different cause of action.  *Gates Rubber*, 9 F.3d at 847.

The parties devote most of their argument to the similarity of the unjust enrichment claim to the scope of rights under § 106, but they seem to agree that the libraries are not copyrightable under § 102.  Even though Mr. Williams testified that he believed he had copyright-like control over the libraries, the Plaintiffs have made their position on copyright clear: the libraries, which are comprised of formulas and algorithms resulting in indicators and strategies, are not copyrightable.  The Court agrees.

The libraries are not covered by the subject matter of copyright because they are ideas that are not fixed to a work of tangible expression.[4]  *See* 17 U.S.C. § 102(a)–(b).  It is possible, and may even be likely, that the written materials Mr. Williams circulates at his seminars, which explain how the formulas in the libraries work and how to use the libraries, come within the subject matter of copyright.  *See* Ex. 599.  But such materials are not at issue in this claim; the

---

[4]     The parties did not address, at a technical level, how the libraries are programmed and manifested within the Trade Navigator software.  The Court will not speculate as to whether an argument could be made that the libraries' representation in computer code – whatever it may be -- could render them "fixed in a tangible medium of expression."

claim concerns only the libraries as they interface with Trade Navigator.  Accordingly, because the libraries are not within the subject matter of copyright, the Court rejects Genesis' argument that the doctrine of Copyright Preemption precludes an unjust enrichment claim.  In addition, the Court notes that because the libraries are not copyrightable, the Plaintiffs have no statutorily-created right to control their use or prevent their continued dissemination by Genesis.

### 2. *The Law of Ideas*

Instead of relying on copyright to support their purported right to control the distribution of the libraries, the Plaintiffs essentially rely on the so-called "law of ideas," which is infrequently addressed but overlaps considerably with copyrights.  *See* 5 *Nimmer on Copyright* § 19D.01.  Generally, there is no property right inherent to mere ideas.  *See Whitfield v. Lear*, 751 F.2d 90, 92 (2d Cir. 1984); *Bowen v. Yankee Network*, 46 F. Supp. 62, 63 (D. Mass. 1942); *Nimmer* § 19D.02[A][3].  However, when coupled with a duty arising from contract principles, some ideas can be protected.  *See, e.g.*, *Desny v. Wilder*, 299 P.2d 257, 266 (Cal. 1956). Typically, such protection is manifested in agreements, either express or implied in fact. *Nimmer* §§ 19D.01[B], 19D.02[A][1][b].

A quasi-contract theory can only go so far these days.  Though such a theory was used frequently to protect ideas at one time, courts have moved away from considering ideas to be protectable property.  *See, e.g.*, *Whitfield*, 751 F.2d at 92; *Joyce v. Gen. Motors Corp.,* 551 N.E.2d 172, 175 (Ohio 1990).  And because ideas are no longer property, causes of action based on the existence of intellectual property in another's possession, like misappropriation of ideas and quasi-contracts,[5] are no longer viable.  *Nimmer* § 19D.03[B][2].  Presently, protection of

---

[5]      Ideas alone still have some protection under state law in New York, New Jersey, and Connecticut, as these jurisdictions recognize misappropriation of ideas as a cause of action.  *See Nimmer* § 19D.02[A][3] (collecting cases).  In the Court's review of authority, Colorado

ideas is only possible through contract or fiduciary principles, specifically arising out of a duty, such that a contract can be implied in fact.[6]  Indeed, the very essence of a quasi-contract is the absence of any such principles and the presence of property-related injustice compelling judicial redress.  Put simply, use of someone's ideas cannot be wrongful without some sort of contractual duty not to make such use.

The list of potential duties here is short.  The only duties found in the Plaintiffs' briefing upon which unjust enrichment can lie are two purported promises by Genesis to pay for the use of the libraries: a latent promise arising from the parties' oral agreement, and a September 2012 letter from Mr. Larson to Plaintiffs' counsel.  For the first, there is no evidence that the parties' oral agreement considered the libraries to be protected, nor is there any evidence that it imposed any penalties for their use beyond the scope of agreement.  The Plaintiffs describe in detail the *quid pro quo* that existed as a result of the parties' contract <u>prior to</u> September 2012, but that arrangement is already covered by an express contract that preempts any possibility of a quasi-contract implied in law.  The Plaintiffs bemoan that they have not received any of the contract's promised items of value since the termination of the contract on September 21, 2012, but this appears to simply be the natural consequence of Mr. Williams' decision to terminate the contract.  There is no evidence from which the Court could conclude that Genesis agreed to continue making payments to the Plaintiffs after the contract ended.

---

recognizes no such cause of action.  Indeed, the Court knows of no Colorado law that treats ideas as property.

[6]     In this vein, the search for an intertwined duty echoes the "extra-element" analysis for copyright preemption, in which a claim only escapes preemption if it adds an element beyond the duties created by copyright protection itself.  *Cf. Gates Rubber Co. v. Bando Chem. Indus. Ltd.,* 9 F.3d 823, 847 (10th Cir. 1993).

For their second point, the Plaintiffs point to an email from Mr. Larson to Plaintiffs' counsel with the following passage:

> Without conceding any factual basis for your conclusions, and reserving all rights, Genesis will, pending a review and analysis of the respective rights of each party, remove all references to Mr. Williams' name, and will, during such review period, cease offering any written works of Mr. Williams. The removal process is underway and will be completed in due course.

Ex. 351. From this passage, the Plaintiffs glean a contractual promise to return or cease use of Mr. Williams' libraries, or "cease and desist the use of all products and our name" (as the Plaintiffs stated at oral argument). *See* Tr. 880:16–17. This letter says no such thing. The letter references only Mr. Williams' name and likeness — a separate basis for unjust enrichment that the Court will address below — and Mr. Williams' "<u>written</u> works." The Plaintiffs have made it abundantly clear that the libraries underlying this claim are not written; otherwise, they might be fixed expressions within the subject matter of copyright. Thus, the email is not susceptible to a construction that Mr. Larson was promising not to make continuing use of Mr. Williams' libraries.

### 3. Analysis

Absent contractual, copyright, or common-law protection, the Plaintiffs have advanced no theory that entitles them to recover for the Defendants' continued use of the libraries. Absent the protection of intellectual property laws or a governing contractual arrangement proscribing the dissemination of ideas for valuable consideration, the creator of an idea retains no property right to control its use or dissemination.[7] *See Joyce*, 551 N.E.2d at 175.

---

[7] The Plaintiffs strongest protection for Mr. Williams' libraries was the parties' contract itself. Alternative, the Plaintiffs could have insisted on a non-disclosure agreement or other continuing contract that would limit the Defendants' ability to use information obtained during the parties' relationship, but it does not appear that they ever had such an agreement.

This conclusion logically obviates multiple aspects of the Plaintiffs' unjust enrichment claim. It does not matter that Genesis changed the name of "LW Sentiment" library to "TN Consensus" without Mr. Williams' permission; if the Plaintiffs cannot prevent others from using the libraries, they cannot prevent them from giving the libraries new names either.[8] *See* Tr. 144:1–12.  Nor does it matter,  as Ms. Stapleton opined, that Genesis was unjustly enriched by selling "Patterns for Profit" in the amount of $60,040.  Tr. 650:11–20, 654:7–8.  "Patterns for Profit" was both a seminar presented by Mr. Williams and a library included in Trade Navigator. There was no testimony that the Patterns for Profit Ms. Stapleton referred to was anything other than the libraries, which, the Court repeats, the Plaintiffs have no ability to control. Unfortunately, the ephemeral nature of non-copyrightable ideas leaves the Plaintiffs with no way to control or restrict Genesis' dissemination of the libraries.  Because LnL Publishing's ownership of the libraries was the only ostensible basis for an unjust enrichment verdict in its favor, the Court finds that a verdict in favor of Genesis and against LnL Publishing on the unjust enrichment claim is required.  As to Mr. Williams, the elimination of libraries as a source of recovery reduces the bases for unjust enrichment to the remaining two categories: data fees and Mr. Williams' name or likeness.

## B.  Data Fees

Trade Navigator (the software itself) requires a one-time purchase, but if customers want market data to inform their trades, they must pay Genesis a monthly subscription fee at varying levels.  Mr. Papagiannis also testified that he currently pays monthly fees to Genesis at $119 a month, but the record reflects that other customers' data fees were as low as $35 a month.    A monthly invoice from Genesis to Mr. Papagiannis indicates that the $119 is the cost of his data

---

[8]     The Plaintiffs did not assert any claims sounding in unfair competition or passing off – the sort of claims typically invoked when one slaps their own name on another's product.

fees, and although it lists several libraries that are enabled for him, including several of Mr. Williams' libraries, there is no additional monthly charge for access to any library. Ex. 133. Thus, by all appearances, data fees reflect the cost of providing data to customers and are unrelated to the number or nature of libraries that customers use.

There is evidence that some users subscribe to Trade Navigator solely or primarily because of Mr. Williams' libraries Even though he can get free data elsewhere, Mr. Papagiannis pays for Genesis data because he wants to continue to use Mr. Williams' libraries. Tr. 165:20–166:3. Mr. Larson estimated that there are about 200 Genesis customers that pay monthly for data and receive Larry Williams libraries. Tr. 403:9–13. From this, the Court concludes that continued access to Mr. Williams' libraries is a motivation for some of Trade Navigators' users to continue to pay monthly data fees to Genesis, rather than choosing to migrate to another software program. This suggests that it is possible that Genesis continues to enjoy a residual benefit – in the form of data fee subscriptions -- from its past association with Mr. Williams.

To assess the scope of that benefit, however, it is necessary to divide Trade Navigator customers who use Mr. Williams' libraries into two categories, using the September 2012 termination of the contract as the dividing line. For customers who purchased Trade Navigator, and Mr. Williams' libraries, before September 2012, the Court cannot say that Genesis has unjustly benefitted by continuing to receive data fees from these customers. The Plaintiffs and the Defendants had a contractually agreed-upon allocation of how the profits derived from these customers would be apportioned, and the verdict on the breach of contract claim ensures that the Plaintiffs will receive their full share of that apportionment. The fact that these customers continue to generate revenue – in the form of data fees – to Genesis after September 2012 because they want to continue to use the Larry Williams libraries they already paid for reflects

nothing more than what is referred to as "vendor lock-in."[9]  Genesis' wager when associating

with Mr. Williams was that customers who began using Trade Navigator because of Mr.

Williams' libraries would continue to subscribe even if Mr. Williams severed his relationship

with Genesis, simply because they had become used to or invested in the software.  Mr. Williams

received the benefit of <u>his</u> bargain – sharing in the sales of Trade Navigator that resulted from his

seminars – but he did not bargain for, nor does he now have a right to receive, a share of data fee

payments from customers who predate September 2012.

      The situation is different with customers who purchased Trade Navigator, based on the

inclusion of Mr. Williams' libraries, <u>after</u> September 2012.  Although one can assume that Mr.

Williams stopped promoting Trade Navigator to his seminar attendees after that date, it is fair to

assume that some new customers, familiar with Mr. Williams, might nevertheless have

discovered his past association with Trade Navigator (and the fact that his libraries can be

included) and decided to give it a try.  For these customers, Genesis receives both the full

purchase price and ongoing data fees.  To some extent, Mr. Williams' reputation has helped to

bring these customers to the table, but Genesis receives all of the benefit of the new customer.  As

---

[9]      Imagine a customer considering the purchase of her first mobile phone.  Two vendors, say Android and Apple, offer competing and mutually-incompatible products.  The Android phone sells for $300; the Apple phone for $500, but because of an aggressive sales decision by Apple, the Apple phone is currently discounted to $200.  The customer chooses the Apple phone, learns to use the Apple operating system, purchases software for and from Apple, and stores her data on Apple's services.

      A few years later, the customer decides to upgrade her phone.  Once again, the newest Android phone sells for $300, the newest Apple model is now $600.  Alas, Apple is not offering her any new discounts.  The user might wish to choose the cheaper Android model this time, but she realizes that she would now have to learn a new operating system, buy new software for the Android phone to duplicate that which she already owns in the Apple environment, and would have to find a way to migrate her data away from Apple's services.  She decides that the inconvenience of switching to the Android phone is not worth the $300 she would save, and chooses the more expensive Apple product simply to avoid hassle.  She has unwittingly been "locked in" to purchasing Apple products now and in the future by virtue of the purchase decision she made years ago.

to these customers, the Court finds that Genesis has been unjustly enriched by the new customers' paying ongoing data fees.

However, the record is murky as to just how many customers in this second category existed. Ms. Stapleton testified that customers were receiving libraries they were not authorized to receive – presumably, customers receiving Mr. Williams' libraries without first paying to attend the associated seminar – suggesting that there may be some customers in the second category, although she did not elaborate further. Mr. Larson testified that Genesis was not enabling Mr. Williams' libraries for new customers after September 2012, such that there would be no customers in the second category. In deference to the jury's advisory verdict, the Court will assume that the jury found Ms. Stapleton's testimony more credible on this point, and thus, the Court will find that there are at least *some* customers paying data fees and receiving libraries that bear Mr. Williams' name or likeness, despite having not attended the associated seminar.

It is obvious that the data fees paid by these customers do not rise to the tune of the $400,000 advisory jury award to Mr. Williams personally, and the Court rejects the jury's quantification to the extent it is premised upon these data fees. Instead, the Court will set forth its own quantification below.

## C.  Name and Likeness

The Plaintiffs allege that, after Mr. Williams terminated the contract in September 2012, Genesis continued to benefit at Mr. Williams' expense by continuing to use Mr. Williams' name and likeness in and associated with the Trade Navigator software. The Court addresses each category of such use separately.

### 1.  Library Names

Ms. Stapleton testified that the presence of Mr. Williams' libraries in the Trade Navigator software confirms for customers "that Larry Williams is endorsing the software, he thinks that people should use it. . . .  They're going to say, wow, I'm going to these people and buy his software."  Tr. 726:3–9.  The way these libraries are integrated with Trade Navigator is memorialized in the screenshots of Exhibit 369.  A user desiring to select a particular library is shown a list of the available libraries by name: "Small Spec Index Change," "Genesis Sentiment Change," "LW Sentiment Change," "ADX Change," etc.  There are libraries that are prefixed with "LW," some with "Larry" or "Williams" in the name, and some that are associated with particular phrases used prominently by Mr. Williams (*e.g.* "Art of Trading 2009"), and the Court will assume that Trade Navigator uses are inherently aware that these libraries are associated with Mr. Williams.

But, except as set forth below, the record does not reflect that a customer buying Trade Navigator for the first time after September 2012 would ordinarily receive access to libraries associated with Mr. Williams.  The Court understands that Trade Navigator only displays libraries that have been enabled for a given user, and users who arrived after Mr. Williams had terminated his association with Genesis would seemingly never have Mr. Williams' libraries enabled in their version of Trade Navigator.  Genesis was not unjustly enriched by continuing to display Mr. Williams' name, initials, or related phrases to customers who had already purchased Trade Navigator <u>before</u> September 2012, and there is little evidence of customers <u>after</u> September 2012 being exposed to those libraries.  The Court understands Leland Wright, the Plaintiffs' expert, to have testified that "only one or two" instances of "unauthorized access" to Mr. Williams' libraries were created by Genesis after October 2012, such that Mr. Wright

declined to even attempt a calculation for it.  Thus, it does not appear that Genesis has been unjustly enriched at Mr. Williams' expense by the display of his library names to users.

### 2.  *Google Searches*

Mr. Williams testified that he has Googled his name and that the Facebook and YouTube pages for Trade Navigator are among the search results.  Tr. 374:7–11.  However, the record does not reflect that Genesis has actively undertaken any efforts to cause these results to occur.  It is more likely that they are simply a vestige of Google's long memory or the algorithmic association of Mr. Williams and Genesis based on their lengthy history together.  Absent evidence that Genesis has purposefully taken some action to cause those websites to continue to associate Genesis with Mr. Williams, this allegation does not support a claim for unjust enrichment.

### 3.  *Facebook Posts*

Ms. Stapleton testified about Genesis' Facebook page for Trade Navigator using Mr. Williams' name and likeness.  Tr. 581.  The Plaintiffs offered several screenshots to support Ms. Stapleton's contention.  The first screenshot contains no reference to Mr. Williams, his name, or likeness.  Ex. 368-01.  The second set of screenshots pertain to a post and accompanying video from November 19, 2010, that depicts Mr. Williams apparently giving a seminar.  Exs. 368-02–05.  Another post from September 3, 2010, states that Trade Navigator will be having a seminar later that month with Mr. Williams as a "special guest presenter".  Ex. 368-06.  Finally, the last screenshot again contains no reference to Mr. Williams, or his name or likeness.  Ex. 368-07.  Ms. Stapleton testified that these Facebook posts "absolutely" give viewers the impression that Mr. Williams is still actively associated with Genesis.  Tr. 727:6–9.

The Court disagrees. As to the two posts that contain Mr. Williams' name or likeness, both were made in 2010, at a time when the parties' association was consensual. Absent contractual terms dictating that, at the conclusion of their relationship, Genesis was required to scrub away any public-facing evidence that the relationship ever existed, Genesis is free to let material that was legally-posted at the time remain available. There is no evidence that Genesis has made Facebook posts referencing Mr. Williams since September 2012.

### 4. *YouTube Videos*

At one point in time, Genesis' YouTube presence included several videos featuring Mr. Williams. Mr. Larson testified that, after September 2012, Genesis made an effort to find and delete every such video. Genesis "missed" six seconds of footage depicting Mr. Williams at the end of a five-minute video on YouTube. Tr. 398:12–13, 399:7. The Court cannot say that that minimal oversight conferred a substantial benefit on Genesis at Mr. Williams' expense.

Ms. Stapleton testified about a number of screenshots she took of Genesis continuing to use Mr. Williams' name and likeness on YouTube after October 2012. Tr. 585–95. 48 of these screenshots are contained in Exhibit 369, depicting 30 YouTube videos.[10] The Court has prepared an appendix following this opinion that summarizes the screenshots and any depiction of Mr. Williams' name or likeness found in them.

According to the screenshots in evidence, the 25 videos that were uploaded after September 2012 and that contained reference to Mr. Williams or depicted a named/initialed Larry Williams library were viewed a total of 16,976 times. Though slight, the Court finds that

---

[10] Notably, Ms. Stapleton testified to the contents of only nine of the 30 videos. The Defendants did not object to the admission of the entire Exhibit 369, even though only a portion of it was supported by an adequate foundation.

these videos depict some association between Mr. Williams and Genesis, conferring some benefit to Genesis at Mr. Williams' expense.

## C. Damages

Having considered all of the evidence presented at trial and the jury's advisory verdict, the Court finds that the following evidence may form the foundation of an award for unjust enrichment to Mr. Williams: (1) the value of the data fees Genesis received from new customers after September 2012; and (2) the value of Mr. Williams' name and likeness as depicted in 25 YouTube videos with a cumulative 16,976 views.

Mr. Wright, the Plaintiffs' expert, calculated damages based on Genesis' receipt of data fees. Tr. 549:7–9. He based his calculation on the data fees Genesis received from customers who had Mr. Williams' libraries enabled. Tr. 502:12–503:3. The Court rejects Mr. Wright's calculations: as explained above, Genesis has <u>not</u> been unjustly enriched by retaining customers who purchased Trade Navigator and Mr. Williams' libraries prior to September 2012. As to those customers, Mr. Williams has received (or will receive) the benefit of his contractual bargain, and Genesis appropriately enjoys the future profits that come from having "locked-in" those customers to Trade Navigator. The Court does not understand Mr. Wright to have estimated the amount of data fees received by Genesis from new customers who might have been attracted to Trade Navigator based on its prior association with Mr. Williams.

Mr. Bernstein testified that he had seen Mr. Williams' name or likeness since September 2012, but could not remember specifically. Trial Tr. 483:13–15. He surmised that he saw it on an Internet ad because he is "regularly looking at the Internet." Trial Tr. 483:16–19. Mr. Bernstein testified that he currently has Mr. Williams' libraries enabled as a Trade Navigator user. Tr. 483:22–484:6. When asked to name the value per year of the benefit Genesis has

received from Mr. Williams' product names, image, and name, Mr. Bernstein testified that he has no "monetary opinion" because it is difficult for him to assess. Tr. 485:10–16. He attempted to suggest a value based on seminars he conducted with Mr. Williams. Tr. 486–87. The sum of his testimony is that the value of Mr. Williams' name and libraries is "well over a million dollars" over the course of "four or five years." Tr. 489:2–18. On cross-examination, Mr. Bernstein stated that these numbers were gross in nature and that he could not speak to the net benefit to Genesis. Tr. 491:6–14.

The Court also accords no weight to Mr. Bernstein's estimates. Seminars that Mr. Bernstein conducted with Mr. Williams have nothing to do with the value of Mr. Williams' visage as leftover on Trade Navigator after September 2012. Even if they did, Mr. Bernstein's testimony is imprecise as to time period and includes at least some value on the libraries themselves, which the Court has found to be unprotected. An advertisement on the Internet might touch on the value of Mr. Williams' name and likeness, but Mr. Bernstein could not describe anything in specific terms despite being an avid Internet user. And he expressly avoided opining to a monetary value. Rather, the Plaintiffs sought to pry an estimate from Mr. Bernstein despite his obvious reluctance to guess.

Moving onto the data fees, Ms. Stapleton testified that there were more than 1,300 LnL customers using Trade Navigator at the time of separation in September 2012. Tr. 710:4–6. At the time of trial, however, Mr. Larson estimated that there are about 200 Genesis customers that pay monthly for data and receive Larry Williams libraries. Tr. 403:9–13. Exhibit 26 contains a list of 194 subscribers to the LW Sentiment library from 2012, so the Court accepts Mr. Larson's estimate. Beyond that, there is little to assist the Court in quantifying how many new customers (*e.g.* those that do not have access to Mr. Williams' libraries) Genesis added after September

2012 due to its prior association with Mr. Williams.  The Court will make an admittedly arbitrary guess and assume that 10 customers – some 5% of the existing Trade Navigator user base -- purchased Trade Navigator after September 2012 because of an awareness that it was once associated with Mr. Williams.  Using $35 a month as the lowest monthly rate for data fees (the same rate Mr. Wright used), a year's worth of data fees earned Genesis $420 per customer.  Multiplied by 10 customers and 5.5 years from September 2012 to today, the total amount of data fees Genesis earned from these customers would be $23,100.

The Court knows of no other federal court attempting to quantify damages based on YouTube views.  Without any evidence or testimony as to the value of a potentially ill-gotten YouTube view, and considering that much of the videos contain only scant, fleeting, or indirect references to Mr. Williams, the Court is inclined to conclude that Mr. Williams' name or likeness granted a benefit to Genesis of no more than $2 per view, resulting in $33,952 in damages.

Combined, these two figures total $57,052.  The Court finds that this is an appropriate award to reflect the maximum extent to which Genesis has benefitted from Mr. Williams' name or likeness after October 2012.  The Court recognizes that this sum is far less than that recommended by the jury, but the Court finds the jury's award unreliable.  The jury heard and considered a large amount of evidence relating to the use and value of Mr. Williams' libraries themselves.  Indeed, it appears that the $1.5 million it awarded LnL Publishing is exclusively based on the value of the libraries.  Furthermore, in light of the Plaintiffs' imprecise presentation of evidence of damages, the Court is satisfied that its smaller award encompasses Genesis' unjust activity under the circumstances.  *See Robinson*, 179 P.3d at 1007.  Accordingly, the Court awards Mr. Williams $57,052 in damages for unjust enrichment due to the misappropriation of his name and likeness, and awards no damages to LnL Publishing.

## V. MOTION FOR EQUITABLE RELIEF

Having adjudicated the unjust-enrichment claim in favor of the Plaintiffs, the Court turns to their request for equitable relief. Specifically, the Plaintiffs ask for (1) an order restraining the Defendants from offering the libraries as their own, (2) an order requiring Genesis to return all of the Plaintiffs' personal property and data to them, and (3) an order requiring Genesis to disable Mr. Williams' libraries for its own employees.

None of the requests finds support in the record. As noted above, the Plaintiffs have no property right to prevent others from using the non-copyrightable formulas contained in the libraries. So long as Genesis re-names those libraries so as not to use Mr. Williams name or associated phrases, it is free to use and distribute the libraries as its own and to allow its employees to use them. As to Mr. Williams' request for an order requiring Genesis to "return his personal property," the Court is unaware of any tangible property that Mr. Williams might be referring to.

As to his request for return of his "data," the Court understands this request to reflect the fact that Mr. Williams did not keep his own copies of his own libraries, formulas, or other data, and that he stored all of that information within his own copy of Trade Navigator. When Mr. Williams terminated the parties' contract in September 2012, Genesis terminated Mr. Williams' continued use of Trade Navigator, effectively locking that data away. This is indeed an unfortunate situation for Mr. Williams (and a reminder to always keep up-to-date backups of important data), but the Court sees nothing in Genesis' actions that is legally wrong or warrants affirmative injunctive relief. The rights of a user in software or the data created therein is usually governed by a licensing agreement, terms of use, or other contractual-type agreement. Mr. Williams has not suggested that Genesis promised him that he would have the right to continue

to use Trade Navigator or access his data therein after the termination of their agreement. The internet is rife with the lamentations of users who created extensive content in a particular website or software program, only to have the host of that site or software abruptly go out of business and shut down the site or software without notice, deleting the users' content. The loss of such content is unfortunate, but not cause for injunctive relief.[11] Accordingly, the Court denies the Plaintiffs' request for additional equitable relief.

## VI.  CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Equitable, Injunctive, and Declaratory Relief (**# 116**) and the Defendants' Renewed Motion for Judgment as a Matter of Law and Renewed Motion to Dismiss (**# 117**) are **DENIED**. Judgment shall enter in favor of the LnL Publishing and against Mr. Larson on the breach-of-contract claims in the amount of $358,277.50. Judgment shall also enter in favor of Mr. Williams and against Genesis on the unjust-enrichment claim in the amount of $57,052.

Dated this 30th day of March, 2018.

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
Chief United States District Judge

---

[11]     One could always argue that Genesis might have a <u>moral</u>, if not necessarily <u>legal</u>, obligation to let Mr. Williams recover his data.  One might also argue that even morals have their price.  The Court is confident that the parties' able counsel may be able to negotiate a resolution to this situation that is palatable, if not necessarily satisfactory, to both sides.

# APPENDIX

| Ex. | Uploaded | Video Title | Larry Williams Content | Views |
|---|---|---|---|---|
| 1 | 10/29/2012 | Commitments of Traders (COT) Data on Trade Navigator | *Depicts tool but no name or likeness* | 478 |
| 2 | 10/29/2012 | Commitments of Traders (COT) Data on Trade Navigator | Larry Williams fields listed with Genesis fields | 478 |
| 3 | 6/18/2013 | Cycle Momentum Master Plug-in | One Larry Williams function listed | 133 |
| 4 | 7/28/2014 | Dynamic Oscillator for Buying Pullbacks | "LWOBV" indicator listed | 643 |
| 5 | 7/28/2014 | Dynamic Oscillator for Buying Pullbacks | "Larry Backup" listed as a library | 643 |
| 6 | 7/28/2014 | Dynamic Oscillator for Buying Pullbacks | Larry Williams listed as a developer of certain strategies | 643 |
| 7 | | *Complete Duplicate of 369-06* | | |
| 8 | 10/29/2012 | Forex Trading with Trade Navigator | "LW Daily Entry" | 1,228 |
| 9 | 8/15/2013 | Getting Started with Trade Navigator | "LW Art of Short Term Trading 2009" listed as library, developer listed as Larry Williams | 5,078 |
| 10 | 8/15/2013 | Getting Started with Trade Navigator | "LW Int Swing" and "LW OBV" listed as indicators | 5,078 |
| 11 | 10/22/2012 | How to Add Items to a Trade Navigator Chart | "LW Art of Short Term Trading 2009" listed as library, developer listed as Larry Williams | 153 |
| 12 | 10/22/2012 | How to Add Items to a Trade Navigator Chart | Multiple Larry Williams studies listed | 153 |
| 13 | 10/22/2012 | How to Archive and Restore Trade Navigator Settings | Larry Williams indicators listed | 291 |
| 14 | 10/22/2012 | How to Change Chart Symbols in Trade Navigator | "LW Art" appears to be a library | 112 |
| 15 | 10/29/2012 | How to Change the Contract Symbol on Trade Navigator Charts | "LW Art" appears to be a library | 251 |
| 16 | 10/22/2012 | How to Create a Custom Library of Functions and Strategies in Trade Navigator | "LW Art of Short Term Trading 2009" listed as library, developer listed as Larry Williams | 341 |
| 17 | 10/22/2012 | How to Create a Custom Library of Functions and Strategies in Trade Navigator | Multiple Larry Williams libraries listed, developer listed as Larry Williams | 341 |
| 18 | 10/22/2012 | How to Create a Custom Library of Functions and Strategies in Trade Navigator | "LNL Pattern Identifier" listed as library, developer listed as Larry Williams | 341 |
| 19 | 10/22/2012 | How to Create a Custom Library of Functions and Strategies in Trade Navigator | Multiple rules listed as a part of "LW Art of Short Term Trading" library | 341 |

| 20 | 10/22/2012 | How to Create Custom Chart Templates in Trade Navigator | Multiple indicators from "LW Art of Trading" listed | 368 |
|---|---|---|---|---|
| 21 | 10/22/2012 | How to Create Custom Chart Templates in Trade Navigator | Multiple Larry Williams studies listed | 368 |
| 22 | 10/29/2012 | How to Customize the Tool Bar in Trade Navigator | "Patterns for Profit" and "Industry Analyst" listed as having a toolbar | 326 |
| 23 | 10/29/2012 | How to Customize the Tool Bar in Trade Navigator | *No apparent connection* | 326 |
| 24 | 10/29/2012 | How to Customize the Tool Bar in Trade Navigator | "Patterns for Profit" and "Industry Analyst" listed as having a toolbar | 326 |
| 25 | 10/22/2012 | How to Customize the Trader's Toolbar in Trade Navigator | *No apparent connection* | 137 |
| 26 | 10/22/2012 | How to Edit Charts in Trade Navigator | "Williams AD" listed under Quote Board | 181 |
| 27 | 10/22/2012 | How to Enable COT Data (Commitments of Traders) in Trade Navigator | "LW Sentiment" listed, apparently in action | 810 |
| 28 | 10/22/2012 | How to Manage Symbol Groups in Trade Navigator | "LW Art" listed as a symbol group | 268 |
| 29 | 10/22/2012 | How to Manage Symbol Groups in Trade Navigator | *No apparent connection* | 268 |
| 30 | 10/22/2012 | How to Open a New Chart Window in Trade Navigator | Multiple Larry Williams indicators listed as Chart Templates | 133 |
| 31 | 8/15/2013 | How to Simplify Trade Sense™ Code | *No apparent connection* | 1,165 |
| 32 | 10/22/2012 | How to Update Data in Trade Navigator | "Williams AD" listed under Quote Board | 257 |
| 33 | 10/29/2012 | Journal your Trades with Trade Navigator | "LW Condition COT" listed in journal example | 867 |
| 34 | 6/18/2013 | Laser Focus Filter Plug-in | "LW Art" listed as a symbol group | 94 |
| 35 | 10/22/2012 | Scoring and Ranking Indicators | "LW Wil-Val" listed twice as conditions | 509 |
| 36 | 10/22/2012 | Scoring and Ranking Indicators | Multiple Larry Williams conditions listed | 509 |
| 37 | 5/14/2013 | Seasonal Sweet Spots and Advanced Seasonal Cycles | *No apparent connection* | 1,217 |
| 38 | 4/26/2013 | Seasonal Trading and the Seasonal Sweet Spots Plug-in | *No apparent connection* | 1,772 |
| 39 | 10/29/2012 | Stock Data with Trade Navigator | "Art of Trading" listed as a trading strategy | 1,256 |
| 40 | 1/16/2012 | Trade Navigator® - An Overview | Larry Williams testimonial for Genesis listed | 2,571 |
| 41 | 1/16/2012 | Trade Navigator® - An Overview | Visual of Larry Williams apparently teaching a seminar | 2,571 |
| 42 | 1/16/2012 | Trade Navigator® - An Overview | Visual of Larry Williams apparently teaching a seminar | 2,571 |
| 43 | 1/16/2012 | Trade Navigator® - An Overview | Visual of Larry Williams apparently teaching a seminar | 2,571 |
| 44 | | *Duplicate of 369-40* | | |

| 45 | 6/18/2013 | Trade Navigator Criteria Toolkit | Multiple Larry Williams charts listed | 376 |
|---|---|---|---|---|
| 46 | 6/18/2013 | Trade Navigator Power Divergence Plug-in | "Art of Trading" listed under Strategies | 198 |
| 47 | 10/22/2012 | Using the What If Tool - Predict How Indicators Respond to Changes in the Market | "To learn more about Larry Williams What if tool, check out www.ireallytrade.com" | 169 |
| 48 | 10/29/2012 | What If Tool - Predict How Indicators Respond to Changes in the Market | "Learn more and visit Larry Williams's website www.ireallytrade.com" | 2,456 |

Ex. 369.